SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

## J.H. v. R&M Tagliareni, LLC (A-6-18) (081128)

**Argued March 26, 2019 -- Decided July 31, 2019**

**FERNANDEZ-VINA, J., writing for the Court.**

The Court considers whether liability should be imposed on a landlord based on a theory of regulatory responsibility over an apartment building's heating system, or based on a new common law duty to cover an apartment unit's radiator with insulating material.

On March 30, 2010, a nine-month-old infant, J.H., suffered permanent scarring when he was burned by an uncovered, free-standing cast iron loop radiator in an apartment owned and managed by defendants R&M Tagliareni, LLC, and Robert & Maria Tagliareni, II, LLC. J.H.'s father placed J.H. in a twin bed to sleep with his ten-year-old stepsister. The bed did not have rails and was adjacent to a steam-heated radiator that did not have a cover. The next morning, J.H. was discovered lying on the floor with his head pressed against the hot radiator.

As a result of the seriousness of J.H.'s injuries, the Hudson County Prosecutor's Office launched a child abuse investigation. Detectives spoke with the building's superintendent, who explained that while the individual apartments were not equipped with thermostat controls, the radiators in each room of the apartments could be shut off by the tenants through valves located at the base of each radiator unit.

J.H. and his guardian ad litem filed suit, alleging defendants' negligence was the cause of J.H.'s injuries. At his deposition, Robert Tagliareni testified that none of his tenants at the property were ever burned by coming into contact with a radiator, and none ever asked for a radiator cover or complained about not having one. Tagliareni testified that his building had been inspected both by state agencies and by insurance companies, but he had never been cited for the absence of radiator covers.

Defendants' apartment building is inspected by the Bureau of Housing Inspection, part of the Department of Community Affairs (DCA), for compliance with the Hotel and Multiple Dwelling Law, N.J.S.A. 55:13A-1 to -28, and the Regulations for Maintenance of Hotels and Multiple Dwellings, N.J.A.C. 5:10-1.1 to -29.1. Myles Pryor, an inspector for the Bureau, inspected defendants' apartment building and its individual units in 2010.

1

Pryor testified that he has seen radiators that do not have any sort of radiator cover on them and that he would not issue a violation to a property owner for not having covers on radiators. Based on his training as a housing inspector, Pryor testified that it is his understanding that there is no requirement under the Hotel and Multiple Dwelling Law that radiators be covered.

The trial court granted defendants' motion for summary judgment, holding that defendants did not owe a common law duty of care to place a cover on the apartment's radiator and were not required by a regulation that governs "heating systems" -- N.J.A.C. 5:10-14.3(d) -- to cover the radiator with insulating material. The Appellate Division reversed, concluding that, under the common law, defendants maintained sufficient control over the heat emanating from the radiator such that a duty of care was owed to J.H. Regarding the regulatory issue, the Appellate Division concluded that plaintiffs should be allowed to argue at trial that N.J.A.C. 5:10-14.3(d) imposed a duty of care upon defendants, and that the duty was breached. The Court granted defendants' petition for certification. 235 N.J. 213 (2018).

**HELD:** The Court is unpersuaded that N.J.A.C. 5:10-14.3(d) imposes any regulatory duty on landlords to cover in-unit radiators with insulating material or a cover. The regulatory scheme provides no evidence of an express or implied intent to include radiators as part of the "heating system" required to be insulated. Having concluded that no such regulatory duty has been imposed, and because the tenants in this case maintained exclusive control over the heat emanating from the radiator, the Court declines to impose on landlords a new common law duty to cover all in-unit radiators.

1. Within the DCA, the Bureau of Housing Inspection administers the Hotel and Multiple Dwelling Law, to which any multi-dwelling building containing three or more apartments is subject. The Law confers broad authority upon the Commissioner of Community Affairs to regulate the construction and maintenance of hotels and multiple dwellings. N.J.S.A. 55:13A-7 (emphasis added) provides that "[a]ny . . . regulations issued and promulgated by the [C]ommissioner pursuant to this section <u>shall provide standards and specifications for such maintenance materials, methods and techniques . . . and such other protective equipment as the [C]ommissioner shall deem reasonably necessary</u> to the health, safety and welfare of the occupants or intended occupants of any units of dwelling space in any hotel or multiple dwelling . . . ." The regulations therefore define with the force of law, <u>see</u> N.J.S.A. 55:13A-7, -9(a), the minimum standards for safety and habitability in multiple dwellings. (pp. 14-17)

2. At issue in this appeal is the application of a regulation contained in the Regulations for Maintenance of Hotels and Multiple Dwellings, which provides as follows with respect to an owner or landlord's specific responsibility concerning the heating system: "The <u>heating system</u>, including such parts as heating risers, ducts and hot water lines, <u>shall be covered with an insulating material or guard</u> to protect occupants and other

2

persons on the premises from receiving burns due to chance contact." N.J.A.C. 5:10-14.3(d) (emphases added). And N.J.A.C. 5:10-14.7(a) (emphasis added) provides that the heating system as herein defined shall be inspected annually." On the other hand, the regulatory scheme calls for in-unit inspections of dwellings only every five years. N.J.A.C. 5:10-1.10(a)-(b). (pp. 17-18)

3. A plain reading of the text of N.J.A.C. 5:10-14.3(d) reveals that the DCA did not include radiators in the regulation's list of items that must be covered with insulating material or a guard. Although "heating system" is not otherwise detailed, the list of what it includes -- besides the unstated but obvious heating source itself -- mentions only heating risers, ducts, and hot water lines. The items listed are all of a kind -- they are beyond the control of the end user and are in the exclusive control of the landlord. Had the DCA determined that radiators required covering, the agency possessed the knowledge and expertise to include them in N.J.A.C. 5:10-14.3(d), and could have easily done so. There is no cause to attribute the absence of the term "radiator" to anything other than the DCA's reasoned determination not to impose under this regulation any requirement that radiators be covered. Even if the regulation were ambiguous, the canons of construction lead to the same conclusion -- radiators need not be covered under N.J.A.C. 5:10-14.3(d). If in-unit radiators are included in the definition of "heating system," the DCA would need to include radiators when inspecting annually under N.J.A.C. 5:10-14.7. The trial court did not err in taking into account Pryor's testimony that he would not issue a violation for not having covers on radiators. (pp. 18-24)

4. Turning to the common-law claim, the Court notes that, in the landlord-tenant context, a landlord has a duty to exercise reasonable care to guard against foreseeable dangers arising from use of those portions of the rental property over which the landlord retains control. The Appellate Division concluded that defendants maintained control over the radiator, relying heavily on Coleman v. Steinberg, 54 N.J. 58 (1969). That reliance is misplaced. The duty imposed in Coleman was to require insulation on a heating system's up-pipe -- which was below the control valve on that radiator such that the control valve did not regulate its temperature. The Court thus found that the up-pipe was within the landlord's control. Here, the tenants' radiator was equipped with a control valve that allowed the tenants to regulate the heat emanating from the radiator. Unlike in Coleman, the radiator's control valve in this case allowed the tenants to determine whether the radiator was on or off, and thus, whether the radiator was hot or cold. The heat emanating from the radiator was therefore solely the result of the tenants' decision to turn on the radiator. That distinction factors into the analysis of fairness in the imposition of a common law duty. Absent control over property or equipment, it violates a sense of fairness to hold a landlord liable for harm caused by an item in the tenant's control. Noting that New York's highest court has declined to impose a duty to cover radiators and that experts in the regulatory area have likewise not imposed any such an obligation, the Court reverses the holding of the Appellate Division judgment that found the existence of a new common law duty. (pp. 24-34)

3

**The judgment of the Appellate Division is REVERSED and the trial court's grant of summary judgment to defendants is REINSTATED.**

**CHIEF JUSTICE RABNER, dissenting, notes that,** in the past decade, thousands of individuals, many of them children, were injured from contact with hot radiators. Landlords have a duty to use reasonable care to guard against foreseeable hazards to tenants that arise from areas within the landlord's control, Chief Justice Rabner observes. More broadly, to assess whether a duty exists under the common law, courts consider the relationship of the parties, the foreseeability and nature of the risk of harm, the opportunity and ability to exercise care, and the public interest; they draw on notions of fairness and common sense to conduct that fact-specific analysis. Based on those principles, in Chief Justice Rabner's view, landlords should have a duty to take reasonable steps to prevent the serious harm that scalding hot radiators can cause. Chief Justice Rabner notes that the DCA's regulations on this point are not entirely clear but at the very least do not preempt a common law duty of care.

**JUSTICES LaVECCHIA, PATTERSON, SOLOMON, and TIMPONE join in JUSTICE FERNANDEZ-VINA'S opinion. CHIEF JUSTICE RABNER filed a dissent, in which JUSTICE ALBIN joins.**

SUPREME COURT OF NEW JERSEY

A-6 September Term 2018

081128

J.H., an infant by his
Guardian Ad Litem, A.R.,
and A.R., individually,

Plaintiffs-Respondents,

v.

R&M Tagliareni, LLC, Robert &
Maria Tagliareni, II, LLC,

Defendants-Appellants.

R&M Tagliareni, LLC, Robert &
Maria Tagliareni, II, LLC,

Defendants/Third-Party Plaintiffs,

v.

J.H., Sr., V.H. and
L.C.,

Third-Party Defendants.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
454 N.J. Super. 174 (App. Div. 2018).

| Argued | Decided |
| --- | --- |
| March 26, 2019 | July 31, 2019 |

Danielle M. Hughes argued the cause for appellants (Koster, Brady & Nagler, attorneys; Danielle M. Hughes, on the briefs).

John E. Molinari argued the cause for respondents (Blume, Forte, Fried, Zerres & Molinari, attorneys; John E. Molinari and Alexa C. Salcito, on the brief).

Michael J. Epstein argued the cause for amicus curiae New Jersey Association for Justice (The Epstein Law Firm, attorneys; Michael J. Epstein, of counsel and on the brief, and Michael A. Rabasca, on the brief).

JUSTICE FERNANDEZ-VINA delivered the opinion of the Court.

In this appeal, the Court considers whether liability should be imposed on a landlord based on a theory of regulatory responsibility over an apartment building's heating system, or based on a new common law duty to cover an apartment unit's radiator with insulating material.

On March 30, 2010, a nine-month-old infant, J.H., suffered permanent scarring when he was burned by an uncovered, free-standing cast iron loop radiator in an apartment that was owned and managed by defendants, R&M Tagliareni, LLC, and Robert & Maria Tagliareni, II, LLC (collectively, defendants).

2

On the night of the accident, J.H. was under the supervision of his father, James,[1] who placed J.H. in a twin bed that did not have railings. The bed was adjacent to a radiator that did not have a cover. The next morning, J.H. was discovered lying on the floor with his head pressed against the hot radiator. J.H. was then rushed to a hospital where it was determined that he had third-degree burns on his head, right cheek, and left arm.

J.H. and his guardian ad litem, A.R., acting both on behalf of J.H. and individually (collectively, plaintiffs), filed suit against defendants alleging that their negligence was responsible for J.H.'s injuries. Following discovery, the trial court granted defendants' motion for summary judgment, holding that defendants did not owe a common law duty of care to place a cover on the apartment's radiator. The trial court further held that, based on a plain reading of N.J.A.C. 5:10-14.3(d), radiators are not encompassed by the term "heating system" and, as a result, the regulation did not require defendants to cover the radiator with insulating material.

The Appellate Division reversed the trial court's summary judgment ruling, concluding that, under the common law, defendants maintained sufficient control over the heat emanating from the radiator such that a duty of care was owed to J.H. as a guest staying in the apartment. According to the

---

[1] "James" is a pseudonym used in this opinion to protect the identity of J.H.

3

Appellate Division, whether that duty was violated was a question for a jury to consider. Regarding the regulatory issue, the Appellate Division concluded that plaintiffs should be allowed the opportunity to argue at trial that N.J.A.C. 5:10-14.3(d) imposed a duty of care upon defendants to prevent the radiator from burning J.H., and that the duty was breached.

After considering the parties' arguments, we are unpersuaded that N.J.A.C. 5:10-14.3(d) imposes any regulatory duty on landlords to cover in-unit radiators with insulating material or a cover. The regulatory scheme provides no evidence of an express or implied intent to include radiators as part of the "heating system" required to be insulated. Having concluded that no such regulatory duty has been imposed, and because the tenants in this case maintained exclusive control over the heat emanating from the radiator, we decline to impose on landlords a new common law duty to cover all in-unit radiators. We therefore reverse the judgment of the Appellate Division and reinstate the trial court's order granting summary judgment in favor of defendants.

## I.

### A.

This action arises from the injuries nine-month-old J.H. suffered in a Jersey City apartment managed and owned by defendants. At the time of the

4

accident, J.H. was under the supervision of his father, James, who was staying at the apartment for the night. James's estranged wife, V.H., lived in the apartment along with her two daughters. At some point in the early morning hours of March 30, J.H. awoke crying in the car seat he was sleeping in. James removed J.H. from the car seat and placed him in a twin bed to sleep with his ten-year-old stepsister.

J.H. was swaddled in blankets to prevent him from falling out of the bed, which did not have rails. The bed was adjacent to a steam-heated cast iron loop radiator. Later that morning, at approximately 6:30 a.m., J.H.'s stepsister found him lying on the floor with his head pressed against the radiator. J.H. was immediately taken to the hospital, where it was determined that he had third-degree burns on his head, right cheek, and left arm, which resulted in permanent scarring. Dr. Hani Mansour advised that due to the severity of J.H.'s burns, J.H. had to have been in direct contact with the radiator for "an extended period of time."

As a result of the seriousness of J.H.'s injuries, the Hudson County Prosecutor's Office investigated the apartment as part of a child abuse investigation. While observing the radiator, Detective Andrew Dellaquila noticed a piece of dried skin and dark colored hairs attached to the exterior of the radiator. Thereafter, the investigating detectives spoke with the building's

superintendent, Francisco Nieves. Nieves escorted Detective Dellaquila down to the basement to show him the boiler room, which was locked and under the exclusive control of defendants. Nieves explained that while the individual apartments were not equipped with thermostat controls, the radiators in each room of the apartments could be shut off by the tenants through valves located at the base of each radiator unit.

Police officers arrested James, and he subsequently pled guilty to fourth-degree child abuse or neglect, contrary to N.J.S.A. 9:6-1 and -3.

B.

On October 7, 2014, plaintiffs filed suit against defendants, alleging defendants' negligence was the cause of J.H.'s injuries. Defendants denied the allegations and also filed a third-party complaint against James, V.H., and Linda -- V.H.'s sister[2] -- claiming that they, as tenants, had control over the apartment's heating and were therefore responsible for J.H.'s injuries.

At his deposition, Robert Tagliareni testified that none of his tenants at the property were ever burned by coming into contact with a radiator, and none ever asked for a radiator cover or complained about not having one. Further, he said that he and his property managers never discussed putting covers on

---

[2] Unbeknownst to defendants, V.H. was subletting the apartment from Linda.

6

radiators because he said he was never told he needed to do so. Tagliareni testified:

> I'm registered with the Department of Housing and Economic Development in the State of New Jersey. They come in every five years, go through the building from top to bottom. They give you your registration and green card, which I have. The City of Jersey City has . . . been in the apartment from time to time. They do inspections. Code Enforcement. I have never been cited with that. I had inspections from insurance companies, I never was cited with that.

Defendants' apartment building is inspected by the Bureau of Housing Inspection, part of the Department of Community Affairs (DCA), for compliance with the Hotel and Multiple Dwelling Law, N.J.S.A. 55:13A-1 to -28, and Regulations for Maintenance of Hotels and Multiple Dwellings, N.J.A.C. 5:10-1.1 to -29.1. Myles Pryor, an inspector for the Bureau, inspected defendants' apartment building and its individual units in 2010.

Pryor testified at his deposition that in order to ensure that hotels and multiple family dwelling units are properly maintained and do not pose a threat to the health and safety of their inhabitants, the Bureau performs inspections every five years. Pryor testified that during the course of his inspections he has seen radiators that do not have any sort of radiator cover on them and that he would not issue a violation to a property owner for not having covers on radiators. Based on his training as a housing inspector, Pryor testified that it is

7

his understanding that there is no requirement under the Hotel and Multiple Dwelling Law that radiators be covered.

The trial court granted defendants' motion for summary judgment, holding that defendants did not owe J.H. a common law duty to cover the tenants' radiator. Regarding the regulatory duty, the trial court determined that radiators were not meant to be included in the term "heating system" based on a plain reading of N.J.A.C. 5:10-14.3(d). Plaintiffs appealed.

The Appellate Division reversed the trial court's decision, holding that defendants owed J.H. a duty to cover the radiator because, "under [the] common law and N.J.A.C. 5:10-14.3(d), the radiator was part of the apartment's heating system subject to defendants' control." J.H. v. R&M Tagliareni, LLC, 454 N.J. Super. 174, 178 (App. Div. 2018). The Appellate Division concluded that a jury must be allowed "to determine whether defendants breached their duty owed to [J.H.]." Ibid.

We granted defendants' petition for certification. 235 N.J. 213 (2018). This Court also granted the New Jersey Association for Justice (NJAJ) leave to appear as amicus curiae.

II.

A.

Defendants argue that the Appellate Division erred in determining that N.J.A.C. 5:10-14.3(d) requires landlords to cover all radiators, and that the Appellate Division's interpretation of the regulation "imposes a never before articulated duty on landlords." In support of their argument, defendants assert that the DCA, "the very agency responsible for interpreting and enforcing the Hotel and Multiple Dwelling [Law]," conducted mandatory inspections of defendants' building -- including all dwelling units -- and has repeatedly issued certificates of inspection, indicating that defendants were in compliance with the Regulations for Maintenance of Hotels and Multiple Dwellings, "both before [and] after the subject accident."

Defendants also argue that the Appellate Division's interpretation of "heating system" conflicts with the regulatory scheme, which reflects that the DCA did not intend for the term "heating system" to include radiators.

> If the [DCA] intended radiators to be part of the "heating system" for the purposes of N.J.A.C. 5:10-14.3(d), then it follows that radiators must also be considered part of the "heating system" for purposes of N.J.A.C. 5:10-14.7. In that case, all radiators in each individual dwelling unit, as a part of the "heating system," would require an annual inspection pursuant to N.J.A.C. 5:10-14.7. However, it is undisputed that the [DCA] does not inspect individual dwelling units on an annual basis. Rather, individual dwelling units and

9

whatever radiators they may contain, are only inspected every five years pursuant to N.J.A.C. 5:10-1.10.

Next, defendants contend the Appellate Division erred in holding that defendants retained exclusive control over the heat emanating from the tenants' radiator and therefore owed J.H. a common law duty with respect to the radiator. Defendants maintain that while landlords do provide heat to tenants -- as required by law -- the landlord does not control the amount of heat emanating from a tenant's individual radiator. According to defendants, the radiator in this case was equipped with a valve that was used by the tenants to control the heat coming into their apartment.

Defendants conclude that the radiator in this case "was simply being used for the only purpose for which it was intended[,] and holding landlords liable for a parent's failure to properly supervise an infant is tantamount to making the landlord an insurer of the property, which is clearly contrary to well-settled public policy."

### B.

Plaintiffs argue the Appellate Division properly concluded that the phrase "heating system" in N.J.A.C. 5:10-14.3(d) encompasses radiators in apartment buildings. Although plaintiffs concede that N.J.A.C. 5:10-14.3(d) does not define the term "heating system," plaintiffs contend "it is clear that the term 'system' encompasses all items relating to the functionality of the

10

heating system." Plaintiffs further argue that "[a]lthough the list included in the regulation [does] not specifically state the word 'radiator,' the language of the statute does not indicate that the provided list [is] exclusive, and thus, the list is not exhaustive." Plaintiffs assert that the DCA's failure to cite defendants for violating N.J.A.C. 5:10-14.3(d) is "neither dispositive nor relevant," and that "[p]lacing considerable weight on the [DCA's] failure to issue a violation and one employee's testimony would produce a result that isn't at all verifiable."

Regarding the issue of common law duty, plaintiffs assert that the Appellate Division was correct in holding that defendants, not the tenants, maintained control over the radiator's temperature. Plaintiffs argue that their radiator's shut-off valve "does not control the temperature of the heat emanating from [the] radiator; only a thermostat can control the specific temperature setting of a radiator."

In support of their position, plaintiffs cite to Coleman v. Steinberg, in which the landlord supplied heat to all tenants of the house "through a single-control heating unit," and this Court held that the landlord therefore "must be deemed to have retained control of the entire system . . . such as the pipes leading from the furnace throughout the building and connecting with the radiators in the rented apartments." 54 N.J. 58, 63-64 (1969). Plaintiffs assert

11

that, "[s]imilarly, the [defendants] here retained control over the entire heating system because the temperature of the radiator[] stemmed from the building's boiler, which was outside of the [tenants'] control." As such, plaintiffs contend that "it would be illogical to conclude that [defendants] did not retain control of the radiator at the time of the incident."

## C.

The arguments presented by NJAJ are similar to those offered by plaintiffs. NJAJ asserts that this Court "should affirm the [A]ppellate [Division]'s determination that N.J.A.C. 5:10-14.3(d) imposes a duty of care on landlords to cover radiators." NJAJ argues that "the enactment's plain language and the available extrinsic evidence of the purposes and objectives of the Act and Regulations support the [A]ppellate [Division]'s findings that N.J.A.C. 5:10-14.3(d) applies to radiators and imposed a duty of care on defendants." NJAJ asserts that N.J.A.C. 5:10-14.3(d)'s focus is to protect the health and welfare of the residents of New Jersey and that the Appellate Division's inclusion of radiators within its purview "undoubtedly advances the objectives of the Act and Regulations."

Regarding the alleged common law duty owed by defendants, NJAJ contends that this Court "should clarify and reaffirm a landlord's well-settled common law dut[ies] to exercise reasonable care[,] to prevent reasonably

12

foreseeable harm[,] and to properly maintain and operate common elements." Like plaintiffs, NJAJ relies on this Court's holding in Coleman.

III.

"In reviewing a grant of summary judgment, we 'apply the same standard governing the trial court -- we view the evidence in the light most favorable to the non-moving party.'" Qian v. Toll Bros. Inc., 223 N.J. 124, 134-35 (2015) (citation omitted). Summary judgment must be granted if "there is no genuine issue as to any material fact challenged and . . . the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c).

"If there exists a single, unavoidable resolution of the alleged disputed issue of fact, that issue should be considered insufficient to constitute a 'genuine' issue of material fact for purposes of Rule 4:46-2." Brill v. Guardian Life Ins. Co., 142 N.J. 520, 540 (1995). "While 'genuine' issues of material fact preclude the granting of summary judgment, those that are 'of an insubordinate nature' do not." Id. at 530 (first quoting R. 4:46-2; then quoting Judson v. Peoples Bank & Tr. Co. of Westfield, 17 N.J. 67, 75 (1954)). As such, "where the party opposing summary judgment points only to disputed issues of fact that are 'of an insubstantial nature,' the proper disposition is summary judgment." Id. at 529 (quoting Judson, 17 N.J. at 75).

13

In deciding whether the Appellate Division appropriately reversed the trial court's order granting defendants' motion for summary judgment, we are tasked with determining whether radiators are part of a multiple dwelling building's "heating system" that N.J.A.C. 5:10-14.3(d) requires to be covered with insulating material or a guard. We must also determine whether defendants in this case maintained control over the tenants' radiator such that defendants owed J.H. a duty under the common law to cover the radiator with insulating material. We address the scope of the regulation first.

IV.

A.

By way of background, "[t]he [DCA] is a State agency created to provide administrative guidance, financial support and technical assistance to local governments, community development organizations, businesses and individuals to improve the quality of life in New Jersey." About DCA, https://www.nj.gov/dca/about/index.html (last visited July 29, 2019). Within the DCA, the Bureau of Housing Inspection administers the Hotel and Multiple Dwelling Law, N.J.S.A. 55:13A-1 to -28.[3]

---

[3] According to its website, "[t]he Bureau is responsible for ensuring that hotels and multiple-family buildings of three or more dwelling units operating within the State of New Jersey are properly maintained and do not pose a threat to the health, safety and welfare of their residents, nor the community in general."

14

Any multi-dwelling building containing three or more apartments is subject to the Hotel and Multiple Dwelling Law and its Regulations for Maintenance of Hotels and Multiple Dwellings. N.J.A.C. 5:10-1.1 to -29.1; N.J.S.A. 55:13A-3(k). Enacted in 1967, the Hotel and Multiple Dwelling Health and Safety Law, now known as the Hotel and Multiple Dwelling Law, superseded the Tenement House Act and "provide[d] stronger and more detailed measures than the [Tenement House Act] for the protection of tenants." Trentacost v. Brussel, 82 N.J. 214, 230 (1980) (citing Braitman v. Overlook Terrace Corp., 68 N.J. 368, 383 (1975)). The Hotel and Multiple Dwelling Law was

> [d]eemed and . . . declared remedial legislation necessary for the protection of the health and welfare of the residents of this State in order to assure the provision therefor of decent, standard and safe units of dwelling space, [and] shall be liberally construed to effectuate the purposes and intent thereof.
>
> [N.J.S.A. 55:13A-2.]

"The Hotel and Multiple Dwelling Law confers broad authority upon the Commissioner of Community Affairs to regulate the construction and maintenance of hotels and multiple dwellings." Rothman v. Dep't of Cmty. Affairs, 226 N.J. Super. 229, 231 (App. Div. 1988). "Most significant is the

---

Bureau of Hous. Inspection, https://www.state.nj.us/dca/divisions/codes /offices/housinginspection.html (last visited July 29, 2019).

15

Legislature's delegation of power to the State Commissioner of Community Affairs to promulgate comprehensive and detailed regulations concerning the condition of a multiple dwelling." Trentacost, 82 N.J. at 230. Pursuant to the Hotel and Multiple Dwelling Law, the Commissioner of the DCA is authorized to

> issue and promulgate . . . such regulations as the [C]ommissioner may deem necessary to assure that any hotel or multiple dwelling will be maintained in such manner as is consistent with, and will protect, the health, safety and welfare of the occupants or intended occupants thereof, or of the public generally.
>
> Any such regulations issued and promulgated by the [C]ommissioner pursuant to this section shall provide standards and specifications for such maintenance materials, methods and techniques . . . and such other protective equipment as the [C]ommissioner shall deem reasonably necessary to the health, safety and welfare of the occupants or intended occupants of any units of dwelling space in any hotel or multiple dwelling . . . ."
>
> [N.J.S.A. 55:13A-7 (emphasis added).]

"These 'standards and specifications' represent the [C]ommissioner's expert judgment that the given safeguards are 'reasonably necessary to the health, safety and welfare of the occupants or intended occupants of any . . . multiple dwelling.'" Trentacost, 82 N.J. at 230 (quoting N.J.S.A. 55:13A-7). "The regulations therefore define with the force of law, see N.J.S.A. 55:13A-7,

16

-9(a), the minimum standards for safety and habitability in 'multiple dwellings.'" Ibid.

At issue in this appeal is the application of a regulation contained in the Regulations for Maintenance of Hotels and Multiple Dwellings: N.J.A.C. 5:10-14.3(d). Section 14.3 generally addresses the standards of maintenance for heating. Subsection (a) of the regulation requires "heating equipment, facilities and system and all parts" to be "kept in good operating condition, free of defects, corrosion and deterioration." Heating equipment, undefined, is addressed in subsections (b) and (c). However, subsection (d), which is at issue here, provides as follows with respect to an owner or landlord's specific responsibility concerning the heating system:

> The heating system, including such parts as heating risers, ducts and hot water lines, shall be covered with an insulating material or guard to protect occupants and other persons on the premises from receiving burns due to chance contact.
> [N.J.A.C. 5:10-14.3(d) (emphases added).]

N.J.A.C. 5:10-14.7(a) further states:

> The heating system as herein defined shall be inspected annually. Such inspection shall be for the following purposes:
>
> 1. To insure that the system is being maintained in accordance with the standards applicable to the system as of the time of installation;

17

2. To locate and remove hazards or conditions that may, if not corrected, foreseeably develop into hazards or become violations of these regulations;

3. To confirm the ability of the system to fulfill the heating requirements provided hereunder.

[ (emphasis added).]

Thus, the "heating system" requires insulation and requires inspection access annually for safety and integrity maintenance purposes. On the other hand, the regulatory scheme calls for in-unit inspections of dwellings only every five years. N.J.A.C. 5:10-1.10(a)-(b).

B.

"When it establishes an administrative agency, the Legislature 'delegate[s] the primary authority of implementing policy in a specialized area to governmental bodies with the staff, resources, and expertise to understand and solve those specialized problems.'" Commc'ns Workers of Am., AFL-CIO v. N.J. Civil Serv. Comm'n, 234 N.J. 483, 514-15 (2018) (alteration in original) (quoting Bergen Pines Cty. Hosp. v. Dep't of Human Servs., 96 N.J. 456, 474 (1984)). We have recognized that the scope of judicial review of an administrative regulation is therefore "highly circumscribed," Lower Main St. Assocs. v. N.J. Hous. & Mortg. Fin. Agency, 114 N.J. 226, 236 (1989), and a

18

reviewing court "will not substitute its judgment for the expertise of the agency." Dougherty v. Dep't of Human Servs., 91 N.J. 1, 6 (1982).

A "regulation should be construed in accordance with the plain meaning of its language and in a manner that makes sense when read in the context of the entire regulation." Medford Convalescent & Nursing Ctr. v. Div. of Med. Assistance & Health Servs., 218 N.J. Super. 1, 5 (App. Div. 1985) (citation omitted). "Whether construing a statute or a regulation, it is not our function to 'rewrite a plainly-written enactment,' or to presume that the drafter intended a meaning other than the one 'expressed by way of the plain language.'" U.S. Bank, N.A. v. Hough, 210 N.J. 187, 199 (2012) (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)).

In this case, a plain reading of the text of N.J.A.C. 5:10-14.3(d) reveals that the DCA did not include radiators in the regulation's list of items that must be covered with insulating material or a guard. Notably, although "heating system" is not otherwise detailed, the list of what it includes -- besides the unstated but obvious heating source itself -- mentions only heating risers, ducts, and hot water lines. Those consist solely of component parts integrally related to the heating source and its conveyance of heat to the individual dwelling units subject to the statutory and regulatory scheme. Further, the items listed are all of a kind -- they are beyond the control of the

19

end user and are in the exclusive control of the landlord. Thus, the express, and plain, language of the regulation reveals that the term "radiator" was omitted from the regulation's list. Further, the terms that are included describe component parts with a fundamentally different functionality than a radiator.

Had the DCA determined that radiators required covering, the agency possessed the knowledge and expertise to include them in N.J.A.C. 5:10-14.3(d)'s language, and could have very easily done so. We see no cause to attribute the notable absence of the term "radiator" to anything other than the DCA's reasoned determination not to impose under this regulation any requirement that radiators be covered, unlike the identified heating system parts such as ducts and hot water lines, which are required to be insulated. See Hough, 210 N.J. at 199 (declining, when enforcing the plain language of a regulation, to engage in "conjecture that will subvert [the regulation's] plain meaning").

The dissent's argument that the DCA did not seek to enter the case as amicus fails to recognize that this Court did not request the DCA to provide its expertise as we have done in numerous cases in the past. Post at ___ (slip op. at 33-34).

20

## C.

Having found that the plain language of N.J.A.C. 5:10-14.3(d) is indicative of the DCA's intent to exclude radiators from the list of items that must be insulated or covered, we need not proceed further. However, even if the regulation's language were ambiguous, application of the canons of construction leads to the same conclusion -- radiators need not be covered under N.J.A.C. 5:10-14.3(d).

The Appellate Division held that the inclusion of a radiator "as part of the apartment's heating system is a logical and sensible interpretation of the regulation's fundamental purpose." J.H., 454 N.J. Super. at 187. The Appellate Division further held that the "[t]he regulation clearly seeks to protect tenants and their guests from being burned [by] 'chance contact' with parts of the heating system." Ibid. The Appellate Division explained that there is "no part of an apartment's heating system that individuals are more likely to be in contact with than the radiator," and concluded that "as a matter of law, plaintiffs can argue at trial that [N.J.A.C. 5:10-14.3(d)] impose[d] a duty of care upon defendants to guard the radiator to prevent it from burning [J.H.], and that the duty was breached." Id. at 187-88. We disagree.

When assessing a regulation's intent, "[t]he same rules of construction that apply to the interpretation of statutes guide our interpretation of

21

regulations." Headen v. Jersey City Bd. of Educ., 212 N.J. 437, 451 (2012) (citing Hough, 210 N.J. at 199). "[A]n agency's construction of a statute over a period of years without legislative interference will under appropriate circumstances be granted great weight as evidence of its conformity with the legislative intent." Malone v. Fender, 80 N.J. 129, 137 (1979). As this Court explained in Cedar Cove, Inc. v. Stanzione,

> [a]ssistance in interpreting a statute can also be derived from the understanding of the administrative agency charged with enforcing it. The meaning ascribed to legislation by the administrative agency responsible for its implementation, including the agency's contemporaneous construction, long usage, and practical interpretation, is persuasive evidence of the Legislature's understanding of its enactment.
>
> [122 N.J. 202, 212 (1991) (citations omitted).]

This "judicial deference to administrative agencies stems from the recognition that agencies have the specialized expertise necessary to enact regulations dealing with technical matters and are 'particularly well equipped to read and understand the massive documents and to evaluate the factual and technical issues that . . . rulemaking would invite.'" Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 575 (1978) (quoting Bergen Pines Cty. Hosp., 96 N.J. at 474); see also In re Election Law Enf't Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 262 (2010) (holding that this Court "will defer to an agency's interpretation of both a statute and implementing regulation, within

22

the sphere of the agency's authority, unless the interpretation is 'plainly unreasonable'").

In this case, DCA inspector Myles Pryor testified that the Bureau performs in-unit inspections every five years. On the other hand, the heating system, which is the landlord's responsibility, is required to be inspected annually. N.J.A.C. 5:10-14.7(a). Thus, the regulatory agency, to which we defer with respect to understanding the intent and scope of its own requirements, is clearly mindful of, and obvious about, when it is imposing an individual dwelling unit access requirement. If we were to conclude that in-unit radiators are included in the definition of "heating system," the DCA would need to include radiators when inspecting under N.J.A.C. 5:10-14.7. And, further, in promulgating the only amendment to the regulation in issue, the DCA was explicit and clear in acknowledging a new one-time upgrade burden it was imposing through the Hotel and Multiple Dwelling rules. The amendment had the effect of imposing an obligation on landlords that required dwelling entry and retroactive modification to the heating units within existing buildings. See 25 N.J.R. 4483 (Sept. 20, 1993) (explaining and clarifying, upon adoption of subsection (e) of N.J.A.C. 5:10-14.3, the agency's intent with respect to the required retroactive modification of pressure relief valve discharge pipes on dwellings' heating units).

23

In our view, the trial court did not err when taking into account Pryor's testimony that he has seen uncovered radiators during inspections and would not issue a violation to a property for not having covers on its radiators because it is his understanding that there is no requirement for radiators to be covered under the Hotel and Multiple Dwelling Law. Based on our own review, that understanding is a fair reading of the regulation, which itself supports that understanding. The regulations are consistent with and bolster the testimony of Pryor.

In sum, in considering the summary judgment record presented and taking into account the DCA's legislatively assigned responsibility to promote and enforce the statutory and regulatory scheme entrusted to it, we conclude that radiators are not included in N.J.A.C. 5:10-14.3(d)'s definition of a "heating system." We therefore reverse the Appellate Division's holding, which recognized a regulatory duty owed by defendants under N.J.A.C. 5:10-14.3(d).

V.

Having determined that defendants owed no regulatory duty to cover the tenants' radiator under N.J.A.C. 5:10-14.3(d), we now address whether defendants maintained control over the tenants' radiator such that the defendants owed J.H. a duty under the common law.

24

As we have explained,

> [t]he fundamental elements of a negligence claim are a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, injury to the plaintiff proximately caused by the breach, and damages. The issues of whether a defendant owes a legal duty to another and the scope of that duty are generally questions of law for the court to decide.
>
> [Robinson v. Vivirito, 217 N.J. 199, 208 (2014) (citations omitted).]

In the landlord-tenant context, "[a] landlord has a duty to exercise reasonable care to guard against foreseeable dangers arising from use of those portions of the rental property over which the landlord retains control." Scully v. Fitzgerald, 179 N.J. 114, 121-22 (2004) (emphasis added). "That duty requires the landlord to maintain that property in a reasonably safe condition." Id. at 122; see also Anderson v. Sammy Redd & Assocs., 278 N.J. Super. 50, 54 (App. Div. 1995) ("It is axiomatic that a landlord is under a common-law duty to maintain premises under its control." (citing Michaels v. Brookchester, Inc., 26 N.J. 379, 382 (1958))). Therefore, "[t]he landlord's duty arises when the harm is foreseeable and the landlord has sufficient control to prevent it." Scully, 179 N.J. at 123 (citing Braitman, 68 N.J. at 382-83).

"This duty has been broadened over the years by the rejection of the caveat emptor theory and the application of the . . . Hotel and Dwelling Act, N.J.S.A. 55:13A-1 et seq." Anderson, 278 N.J. Super. at 54. However, "[a]

25

landlord's duty is not absolute. It is not an insurer for the safety of its tenants." Ibid.

At issue in this matter is whether defendants maintained control over the subject radiator such that they owed J.H. a duty of care. The Appellate Division concluded that defendants did maintain such control over the radiator, relying heavily on this Court's ruling in Coleman v. Steinberg to guide its analysis. J.H., 454 N.J. Super. at 182-84. We find the reliance on Coleman to be misplaced. The duty imposed by our Court in Coleman to require insulation on a heating system's up-pipe -- which was below the control valve on that radiator such that the control valve did not regulate its temperature -- is fully consistent with the approach taken in the regulatory duty analysis that we just performed.

In Coleman, a one-year-old plaintiff suffered severe burns when his leg was caught in between a wall and an uncovered, hot up-pipe. 54 N.J. at 61-62. The trial court granted the landlords' motion to dismiss, finding that there were insufficient facts to establish a violation of a legal duty owed by the landlords to the infant plaintiff. Id. at 62. The Appellate Division reversed, holding that the landlords owed a duty to the tenants to maintain the exposed pipe in a reasonably safe condition. Ibid.

26

In its analysis, our Court in <u>Coleman</u> determined that when "the landlord . . . provides certain facilities for the common use or benefit of all the tenants, possession and control of such portions or facilities remain in him and do not pass to the tenants." <u>Id.</u> at 63. "In such situations the law imposes upon the landlord the duty of maintaining [those portions] in a reasonably safe condition for the use and enjoyment of the tenants," and "[i]f he fails to do so and such failure results in injury to the tenant or persons on the premises[,] . . . ordinarily the landlord is liable for the injury." <u>Ibid.</u>

Applying those principles, the <u>Coleman</u> Court affirmed the Appellate Division's determination because it found that the up-pipe was within the landlord's control. The Court explained:

> [S]ince the landlords supplied heat to both tenants of the premises through a single-control heating unit, they must be deemed to have retained control of the entire system. <u>That system included all of the portions thereof which entered into its operation, such as the pipes leading from the furnace throughout the building and connecting with the radiators in the rented apartments.</u> Having retained that control, the landlords were under a duty to use reasonable care to guard against hazards to members of the tenants' family, such as the infant plaintiff, arising out of the maintenance and operation of the system.
>
> Since the child was <u>burned by the exposed up-pipe</u> while he was crawling around the floor, the Appellate Division majority concluded, and we agree, that the jury could reasonably have found that a dangerous condition existed in the heating system, and

27

that the defendants had failed to exercise reasonable care to guard against that clearly foreseeable kind of injury.

[Id. at 63-64 (emphases added) (citations omitted).]

The Coleman Court commented on the practice of covering heating equipment as a safety precaution. Id. at 64. "We cannot close our eyes to the commonplace fact that pipes like those involved here can be protected by a covering or shield, and that a protective covering or shield is readily available for the unit of pipe and radiator at modest cost." Ibid. "[T]here is nothing in the record to suggest that furnishing such protection would be unreasonably burdensome." Ibid. In support of its analysis, the Coleman Court cited to the Hotel and Multiple Dwelling Law -- even though it was not applicable to the facts of the case.[4] According to the Court, the regulations promulgated under the Hotel and Multiple Dwelling Law

> reveal an awareness by an expert public agency of the existence of a hazard presented by uncovered pipes which are part of a central heating system maintained by a landlord. It indicates also a conclusion by the agency that imposition of the specified duty of covering or guarding such pipes is not an arbitrary or unreasonable one. And in our opinion it supports the view that in the present case the evidence created a jury

---

[4] Although the Hotel and Multiple Dwelling Law and its regulations for the Maintenance of Hotels and Multiple Dwellings were in existence at the time the accident occurred in Coleman, the Court did not apply the regulations to the facts of the case because the landlords' two-family house did not constitute a multi-family dwelling subject to the regulations. See id. at 65.

28

question as to whether the underlined exposed pipe constituted a condition which was dangerous to the tenants and members of their family and whether defendants were negligent in permitting it to remain exposed and without any protective covering or guard.

[Id. at 65 (emphases added) (citations omitted).]

A crucial factual distinction exists between the radiator in this case and the up-pipe in Coleman. The temperature of the up-pipe that burned the plaintiff in Coleman was not controlled by the shut-off valve in the tenant's radiator. Id. at 61. Here, the tenants' radiator was equipped with a control valve that allowed the tenants to regulate the heat emanating from the radiator. The control valve was located on the base of the radiator, in the tenants' apartment, solely within the tenants' control. The Appellate Division conceded this in its opinion, noting that "[t]he shut-off valve . . . allows the flow of heat to the radiator to be manually turned on or off." Ibid. The Appellate Division also offered the following noteworthy observation: "Coleman notes that the landlord maintained control of the up-pipe because the shut-off valve was located above the up-pipe, meaning the shut-off valve bore no effect on the temperature of the uncovered up-pipe, which burned the plaintiff." Ibid. (emphasis added).

Unlike in Coleman, where the shut-off valve bore no effect on the temperature of the up-pipe, the radiator's control valve in this case allowed the

29

tenants to determine whether the radiator was on or off, and thus, whether the radiator was hot or cold. The heat emanating from the radiator was therefore solely the result of the tenants' decision to turn on the radiator. That distinction factors into the analysis of fairness in the imposition of a common law duty. Absent control over property or equipment, it violates a sense of fairness to hold a landlord liable for harm caused by an item in the tenant's control.

New York's highest court confronted this exact issue in Rivera v. Nelson Realty, LLC, where the Court of Appeals determined that "the landlord of a home where children live does not have a common-law . . . duty to provide or install radiator covers." 858 N.E.2d 1127, 1127 (N.Y. 2006).

In that case, a three-year-old child was left unsupervised by his parents as he played with his four and two-year-old brothers. Ibid. While unsupervised, the child climbed onto an uncovered radiator in his parents' bedroom and tragically endured serious burns. Ibid. In the months preceding this accident, the child's parents had asked the defendants -- the landlord and property manager -- to provide radiator covers, but were denied on the grounds of expense. Id. at 1127-28.

In reaching its ruling, the court noted that "[a]t common law, liability in tort with respect to land and buildings generally depend[s] on occupation and

30

control; as a result, it [is] the tenant, not the landlord, who [is] generally held responsible for injuries caused by the condition or use of leased premises." Id. at 1129 (quoting Ramos v. 600 W. 183rd St., 547 N.Y.S.2d 633, 635 (App. Div. 1989)). The Court ultimately concluded that the common law does not require landlords "to cover radiators in rented apartments where young children live" and that "defendants [had therefore] breached no duty to plaintiffs, and plaintiffs' complaint was properly dismissed." Id. at 1130.

We now are asked to expand our common law in a way that our sister state has declined, thoughtfully, to do. And we are asked to do so when experts in the regulatory area have not imposed any such an obligation. We acknowledge that "[t]he power of growth is inherent in the common law." State v. Culver, 23 N.J. 495, 506 (1957). However, here we are being asked to impose a duty beyond that which a regulatory scheme imposes, which would result in an upending of settled expectations. Moreover, it is a duty that would be imposed regardless of control. That combination militates against taking this step in the common law's development.[5]

"This Court has carefully refrained from treating questions of duty in a conclusory fashion, recognizing that, '[w]hether a duty exists is ultimately a

---

[5] Our discussion reflects our view that the state of regulatory requirements informs our decision and is a factor in judging whether to expand the common law.

31

question of fairness.'" Weinberg v. Dinger, 106 N.J. 469, 485 (1987) (alteration in original) (quoting Kelly v. Gwinnell, 96 N.J. 538, 544 (1984)). As this Court stated in Estate of Desir v. Vertus, "[i]n deciding whether to recognize the existence of a duty of care, . . . [we] must bear in mind the broader implications that will flow from the imposition of a duty." 214 N.J. 303, 325-26 (2013).

In this case, defendants did not retain control over the subject radiator. The tenants had a control valve on the radiator. But that was not sufficient under the Appellate Division's analysis -- the Appellate Division determined that a thermostat or other device controlling the level of heat coming out of the radiator is required to demonstrate that the tenant controlled the heat emanating from the radiator. We do not impose this duty under the common law. As was the case in Rivera, the facts of this case reveal that defendants did not maintain control over the heat emanating from the tenants' radiator; the tenant did, and therefore defendants owed J.H. no duty to cover it with insulating material.

Moreover, and as noted, defendants had no notice -- actual or constructive -- that they were responsible for such devices. The previously cited comments that were made in connection with the adoption of subsection (e) of N.J.A.C. 5:10-14.3, at the time of the readoption of the rules pertaining

32

to the Hotel and Multiple Dwelling Law, offer insight into the typical consultation that takes place when landlords are burdened with new responsibilities. 25 N.J.R. 4483 (Sept. 20, 1993). At the hearing, a concern was raised that the new requirement -- requiring landlords to connect pressure relief valves to a discharging pipe -- was in conflict with existing requirements of the statewide plumbing subcode of the UCC. Ibid. After considering this problem, the DCA revised the new regulation. Ibid.

The rules hearing contained ample discussion regarding the burdens being imposed on landlords as to discharge pipes; there is no corresponding discussion, anywhere in the history of the rule, evidencing a similar debate about retrofitting radiators. A logical conclusion is that there was a consensus that the regulation did not impose the duty regarding radiators that the Appellate Division imposed here.

To be sure, it is not necessary for a regulatory body to impose a duty before the common law can be expanded. But, in this instance, to expand the common law to impose a duty on landlords to place covers on radiators -- without prior notice and where the regulatory agency responsible for policy discussions on exactly this type of action and the consequences of such expansion has not imposed such a requirement -- would be contrary to concepts of fairness. In sum, we decline to expand the common law so as to

33

require landlords to cover radiators with insulating material.  We therefore also reverse the holding of the Appellate Division judgment that found the existence of a new common law duty.

VI.

For the reasons stated herein, we reverse the judgment of the Appellate Division and reinstate the trial court's grant of summary judgment to defendants.

JUSTICES LaVECCHIA, PATTERSON, SOLOMON, and TIMPONE join in JUSTICE FERNANDEZ-VINA'S opinion.  CHIEF JUSTICE RABNER filed a dissent, in which JUSTICE ALBIN joins.

J.H., an infant by his
Guardian Ad Litem, A.R.,
and A.R., individually,

Plaintiffs-Respondents,

v.

R&M Tagliareni, LLC, Robert &
Maria Tagliareni, II, LLC,

Defendants-Appellants.

R&M Tagliareni, LLC, Robert &
Maria Tagliareni, II, LLC,

Defendants/Third-Party Plaintiffs,

v.

J.H., Sr., V.H. and
L.C.,

Third-Party Defendants.

CHIEF JUSTICE RABNER, dissenting.

In the past decade, thousands of individuals, many of them children, were injured from contact with hot radiators. Of that large group, it is estimated that more than ten thousand people were injured so seriously that

1

they sought treatment at emergency rooms.  The burns are sometimes fatal.  And experience teaches us that unless precautionary steps are taken, people will continue to suffer the same types of injuries year after year.

Landlords have a duty to use reasonable care to guard against foreseeable hazards to tenants that arise from areas within the landlord's control.  Coleman v. Steinberg, 54 N.J. 58, 63 (1969); Ellis v. Caprice, 96 N.J. Super. 539, 547 (App. Div. 1967).  More broadly, to assess whether a duty exists under the common law, courts consider "the relationship of the parties," the foreseeability and nature of the risk of harm, "the opportunity and ability to exercise care, and the public interest."  Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439, 442-43 (1993).  Courts "draw on notions of fairness [and] common sense" when they conduct that fact-specific analysis.  Id. at 443.

Based on those principles, landlords should have a duty to take reasonable steps to prevent the serious harm that scalding hot radiators can cause.  A simple radiator cover, available at most home improvement stores for a modest cost, can prevent the foreseeable risk that countless apartment dwellers face.  It can spare a child from being scalded and scarred.

Jimmy,[1] the nine-month-old child at the heart of this appeal, suffered severe burns from a radiator on March 30, 2010.  Jimmy's father had placed

[1] "Jimmy" is a fictitious name used to protect the child's identity.

2

him in a twin bed to sleep beside his stepsister. The bed did not have rails and was near a steam-heated cast-iron radiator. Hours later, the stepsister found Jimmy on the floor, wedged between the radiator and the bed, with his head pressed against the radiator.

Jimmy was rushed to the hospital. He had third-degree burns on his head and left arm. The burns covered three percent of his body. Based on the severity of the burns, a physician opined that Jimmy was probably in direct contact with the radiator for an extended period of time. Detectives from the Hudson County Prosecutor's Office later found dried skin and hair attached to the radiator. Jimmy, now a young boy, has permanent scarring.

Jimmy was injured in a rental apartment in Jersey City. The record reveals that the landlord controlled the temperature of the steam coursing through the radiators; the tenants did not. Tenants who can turn heat on or off are hardly in control. On cold days, the choice to heat an apartment or sit in the cold is hardly a choice at all, because heat is a necessity, not an option. And when tenants turn the heat on, radiator burns are an entirely foreseeable risk that can be protected against.

The Department of Consumer Affairs' regulations on this point are not entirely clear. At the very least, the regulations do not preempt a common law

duty of care that requires landlords to exercise reasonable care and protect against foreseeable dangers.

In my view, a jury should decide if the common law duty was breached here. I therefore respectfully dissent.

I.

The risk of danger tenants face in this area is readily understood: injury from touching a radiator with scalding hot steam coursing through it. Common sense alone tells us that type of risk is reasonably foreseeable and is often severe enough to require emergency medical treatment. Adults and children alike can be injured from contact with a hot cast-iron radiator. And multiple studies conducted by well-respected government and private entities confirm that day-to-day reality.[2]

---

[2] Courts can take judicial notice of studies and statistics from suitable sources under N.J.R.E. 201(b)(3) ("Facts which may be judicially noticed include . . . specific facts and propositions of generalized knowledge which are capable of immediate determination by resort to sources whose accuracy cannot reasonably be questioned."). This Court has done so many times. See, e.g., Lindquist v. City of Jersey City Fire Dep't, 175 N.J. 244, 273 (2003); Planned Parenthood of Cent. N.J. v. Farmer, 165 N.J. 609, 640 (2000); State v. Terry, 430 N.J. Super. 587, 594 n.5 (App. Div. 2013), aff'd, 218 N.J. 224 (2014); see also J.S. v. R.T.H., 155 N.J. 330, 341 (1998) (relying on U.S. Department of Justice statistics as "empirical support for the conclusion that sexual abuse of a child . . . is a risk that can be foreseen by a spouse"). On appeal, a "reviewing court in its discretion may take judicial notice of any matter specified in Rule 201, whether or not judicially noticed by the judge." N.J.R.E. 202(b).

4

The Centers for Disease Control and Prevention (CDC), the leading national public health agency and a component of the U.S. Department of Health and Human Services, reported on a study in 1996 that noted "an estimated 1881 children visited emergency departments for treatment of burns" from radiators in the United States in 1993. CDC, Home Radiator Burns Among Inner-City Children -- Chicago, September 1991-April 1994, 45 Morbidity & Mortality Wkly. Rep. 814, 814 (1996).

The study also investigated home radiator burns suffered by ten children treated in a single Chicago pediatric clinic in the early 1990s. Ibid. As in Jimmy's case, steam radiator systems were involved in at least eight of the cases, and investigators determined that "the burns . . . were associated with contact with uncovered radiators." Ibid. The CDC noted that "[c]ontact with temperatures in the range of steam radiators can cause an instantaneous full-thickness burn of adult human skin" and that "[c]hildren's skin is probably more susceptible . . . to thermal injury." Id. at 815. The CDC observed that "[r]isks for burns from home radiators can be reduced by keeping the unit covered and the pipes insulated." Ibid.

Another study from the New York Hospital-Cornell Burn Center revealed that, in the first five months of 1997, "[r]adiator burns accounted for 59% of pediatric contact burns seen at [the] institution." A.M. O'Neill et al.,

5

Radiator Burns: A Pediatric Dilemma, 19 J. of Burn Care & Rehabilitation S156 (Jan. 1998), https://doi.org/10.1097/00004630-199801001-00044. The study concluded that "[h]eating systems that use radiators pose a great hazard to children under the age of 5" and, more generally, are "a major cause of contact burn injuries." Ibid. Based on a review of admissions to the Burn Center, the study noted "a need for implementation of a prevention program on the dangers of radiators." Ibid.

Globally, "[i]n high-income countries, children under the age of five years old are at the highest risk of hospitalization from burns," and "[t]he burns [infants] suffer are most commonly the result of scalds from cups containing hot drinks or contact burns from radiators or hot-water pipes." World Health Organization, World Report on Child Injury Prevention 81 (Margie Peden et al. eds., 2008) (emphasis added); see also id. at 85 ("Infants under the age of one year are in a particular category, as their mobility starts to develop and they reach out to touch objects. Consequently, burns to the palms of the hands are particularly common, as a result of touching heaters or hot-water pipes." (endnote omitted)); Kyran P. Quinlan, Injury Control in Practice: Home Radiator Burns in Inner-City Children, 150 Arch. Pediatr. Adolesc. Med. 954, 956-57 (1996) ("The exposure of a curious but unsteady

6

toddler to an uncovered steam radiator or uninsulated radiator pipe represents an obvious hazard.").

The U.S. Consumer Product Safety Commission -- a federal agency "charged with protecting the public from unreasonable risks of injury or death associated with the use of . . . consumer products," About CPSC, U.S. Consumer Prod. Safety Comm'n, https://www.cpsc.gov/About-CPSC -- has also gathered data on injuries from radiators. The agency operates a system known as the National Electronic Injury Surveillance System (NEISS), which collects and publishes "data on consumer-product-related injuries." NEISS Frequently Asked Questions, U.S. Consumer Prod. Safety Comm'n, https://www.cpsc.gov/Research--Statistics/NEISS-Injury-Data/Neiss-Frequently-Asked-Questions. NEISS gathers data from a representative sample of about 100 hospitals across the nation, from which it extrapolates the number of injuries treated at the more than 5000 emergency departments at hospitals in the United States. Ibid. The following statistics were generated from the NEISS Online Database, https://www.cpsc.gov/cgibin/NEISSQuery/home.aspx.[3]

---

[3] Each query used the product code "Radiators (excluding Vehicle Radiators) (379)" and included "Burns" for the diagnosis group.

7

In 2001, hospital emergency departments in the United States treated an estimated 3000 burn injuries from building radiators.[4]  In the ten years from 2009 through 2018, emergency rooms treated an estimated 14,688 radiator burns.[5]  In 2010, the year Jimmy was injured, an estimated 1312 individuals sought treatment for radiator burns in hospital emergency rooms; the estimate rose to 1738 for 2011.[6]

Although high, the data likely understates the problem because it does not include radiator burns treated outside of a hospital emergency department -- for example, at an urgent care facility, a doctor's office, or at home.

---

[4]  U.S. Consumer Prod. Safety Comm'n, NEISS 1999-2018 Online Database, https://www.cpsc.gov/cgibin/NEISSQuery/CaseDetail.aspx?JobId=4zRR2G7TyYy WZKQDMTMUmA%3d%3d&Title=9OYR9kUytIsLilKZieD5xg%3d%3d&Outp utFormat=9OYR9kUytIsLilKZieD5xg%3d%3d&Type=v0Dpcp2JcG93HTGffrG MT6V6GBbmxC9Tf%2fM5FmggZ1M%3d&UserAff=CvbkBwSYvXoJ%2blc0Tf zwdg%3d%3d&UserAffOther=9OYR9kUytIsLilKZieD5xg%3d%3d.

[5]  Id. at https://www.cpsc.gov/cgibin/NEISSQuery/CaseDetail.aspx?JobId= mBHzH6bZd8OUhEvMxeI9TQ%3d%3d&Title=9OYR9kUytIsLilKZieD5xg%3d %3d&OutputFormat=9OYR9kUytIsLilKZieD5xg%3d%3d&Type=v0Dpcp2JcG93 HTGffrGMT6V6GBbmxC9Tf%2fM5FmggZ1M%3d&UserAff=CvbkBwSYvXoJ %2blc0Tfzwdg%3d%3d&UserAffOther=9OYR9kUytIsLilKZieD5xg%3d%3d.

[6]  Id. at https://www.cpsc.gov/cgibin/NEISSQuery/CaseDetail.aspx?JobId= FwBKQDx5NwrakZi4nfda%2fA%3d%3d&Title=9OYR9kUytIsLilKZieD5xg %3d%3d&OutputFormat=9OYR9kUytIsLilKZieD5xg%3d%3d&Type=v0Dpc p2JcG93HTGffrGMT6V6GBbmxC9Tf%2fM5FmggZ1M%3d&UserAff=Cvbk BwSYvXoJ%2blc0Tfzwdg%3d%3d&UserAffOther=9OYR9kUytIsLilKZieD5 xg%3d%3d.

Burns can also be fatal. In 1975, six-month-old twins rolled off a bed and were burned by a hot radiator in a Trenton apartment; one of the twins died and the other suffered burns over thirteen percent of her body. Hot Radiator Kills Infant in Trenton, N.Y. Times, Nov. 29, 1975, at 57.

The risk of harm from scalding hot radiators is real and well documented. The harm itself is serious and sometimes fatal. And those harmed are often the most vulnerable among us.

## II.

Summary judgment is appropriate when "there is no genuine issue as to any material fact challenged and . . . the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). The record is viewed in the light most favorable to the non-moving party -- in this case, the tenants.[7] See Caraballo v. City of Jersey City Police Dep't, 237 N.J. 255, 264 (2019) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995)).

One aspect of the record, in particular, requires close examination: the nature of the heating system. For the most part, the facts are not in dispute. The apartment building had a centralized steam heating system. A gas-fired

---

[7] For ease of reference, plaintiffs and third-party defendants -- the apartment's tenant, her family members, and guests -- are referred to as "tenants." Defendants are R&M Tagliareni, LLC, and Robert & Maria Tagliareni, II, LLC. They owned and managed the property and are referred to as the "landlord."

steam boiler in the basement -- in a locked room that the landlord exclusively controlled -- supplied heated steam to radiators in each apartment. Tenants had no access to the room; only the building superintendent and the owner's son could enter it. A timer in a locked box in the boiler room controlled the boiler.

Steam travelled through pipes from the boiler to radiators in the apartments; an uninsulated pipe extended vertically from the apartment floor and connected to the radiator that burned Jimmy. The free-standing, cast-iron loop radiator was in the corner of a small bedroom; it was 2'2" tall, 6" wide, and 1'5" long.

A shut-off valve at the base of the radiator allowed steam heat into the unit. The superintendent explained at his deposition that "[m]any tenants open and close it there." When asked if the valve "just allows you to open it and close it. It doesn't allow [tenants] to set a specific temperature?" the superintendent replied, "[y]es."

After Jimmy was burned, detectives from the Prosecutor's Office investigated the site. They heard the heating system activate and observed that, within about two minutes, the radiator "went from cool . . . to extremely hot and unbearable to the touch." The tenants' expert engineer noted that steam is generated at 212 degrees Fahrenheit under ordinary atmospheric

10

pressure.  However, "[a]s the pressure in a low-pressure boiler system increases[,] so does the temperature for the creation of steam."  "Clearly," the expert opined, "with temperatures above 200° in a radiator[,] contact with its cast iron surface would be unbearably hot."

At oral argument and in written submissions during the appellate process, counsel for the landlord argued that tenants can "turn the radiator on and off <u>and</u> adjust the temperature in between."  For support, the landlord relied on the following exchange at Mr. Tagliareni's deposition:

> Question:  Do you have any knowledge of -- are you aware of what the temperature of those radiators can get to?
>
> Answer:  Depending on the tenant operating the valve on the side of the radiator, it can be regulated from off to full capacity.

Beyond that, the record is sparse.  At most, it supports an inference that the valve controlled the amount or flow of steam into the radiator,[8] but no one testified that tenants could adjust the temperature.  The parties also do not dispute that there were no thermostats in the apartments.

---

[8]  At oral argument, defense counsel referred to deposition testimony that could support such an inference but is not in the record.  The additional testimony would not alter the analysis that follows.

The radiator that burned Jimmy was not covered. Some radiators in the building had covers that varied in size. All of them had been installed before the superintendent began working in the building -- roughly ten years before the accident. He never installed a cover.

Mr. Tagliareni testified that no tenant ever complained or insisted they wanted a radiator cover, and none of the building's tenants ever sustained a burn from contact with a radiator. He added that he probably would have supplied a radiator cover had a tenant asked for one. At oral argument, defense counsel conceded that cost is "not a huge expense."

The parties also deposed Myles Pryor, an inspector for the Bureau of Housing Inspection, which is part of the Department of Community Affairs (DCA). Mr. Pryor had inspected the apartment building in Jersey City. He testified that, as far as he understood, the applicable DCA regulation -- N.J.A.C. 5:10-14.3(d) -- did not require landlords to cover radiators. Although he conceded on cross-examination that it was "possible" the regulation included radiators, he stated that, based on his training, he would not issue a violation to a building for not having a cover on a radiator. The landlord likewise testified that, despite multiple inspections, he had never received a violation or citation from a government agency for an uncovered radiator.

III.

The trial court found that the landlord did not owe a duty of care under either the common law or the DCA regulation. The court therefore granted the landlord's motion for summary judgment.

The Appellate Division reversed. J.H. v. R&M Tagliareni, LLC, 454 N.J. Super. 174 (App. Div. 2018). It relied heavily on Coleman to conclude that the landlord had a common law duty of reasonable care to protect tenants and their guests from the hot radiator. Id. at 181-86.

The court reasoned, as in Coleman, that the landlord controlled the heating system, of which the radiator was a part. Id. at 178, 184. The Appellate Division observed that the shut-off valve and absence of a thermostat amounted to "an ineffective or illusory transfer of the temperature control of the heating system." Id. at 184. Under the circumstances, the court found that the landlord retained "sufficient control" to extend a duty of care to Jimmy under the common law. Id. at 185-86. The court also noted that "a cover on the radiator would have guarded against burns" and that "nothing in the record . . . suggest[s] it was unreasonably burdensome for defendants to cover the radiators." Id. at 184-85.

The Appellate Division also concluded that the landlord owed a duty of care under N.J.A.C. 5:10-14.3(d). Id. at 186-88. The court looked to the

13

regulation's plain language and purpose to find that it encompassed radiators: namely, that landlords must insulate or guard an apartment building's "heating system" to protect people from accidental burns. Ibid.

### IV.

To sustain a cause of action for negligence, the tenants must establish that the landlord breached a duty of care owed to Jimmy that proximately caused his injury. See Townsend v. Pierre, 221 N.J. 36, 51 (2015) (noting that the elements of a negligence action are "(1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages" (quoting Polzo v. County of Essex, 196 N.J. 569, 584 (2008))). Whether a duty exists lies at the heart of this appeal.

In certain areas of negligence law, such as the duties that landlords owe tenants, settled common law principles provide guidance. In particular, "[a] landlord has a duty to exercise reasonable care to guard against foreseeable dangers" that arise from the use of "portions of the rental property over which the landlord retains control." Scully v. Fitzgerald, 179 N.J. 114, 121-22 (2004) (citing Braitman v. Overlook Terrace Corp., 68 N.J. 368, 381 (1975); Coleman, 54 N.J. at 63-64; Anderson v. Sammy Redd & Assocs., 278 N.J. Super. 50, 54 (App. Div. 1994); Ellis, 96 N.J. Super. at 547); see also Restatement (Second) of Torts §§ 360, 361 (Am. Law. Inst. 1965); 23A N.J.

14

Practice, Landlord and Tenant Law § 47.1 (Raymond I. Korona) (rev. 5th ed. 2019); cf. Restatement (Third) of Torts § 53(a). Control and foreseeability are thus central to the existence and scope of a landlord's duty of care.

The common law duty requires landlords to maintain property they control "in a reasonably safe condition." Scully, 179 N.J. at 122; see also Coleman, 54 N.J. at 63; Linebaugh v. Hyndman, 213 N.J. Super. 117, 120-21 (App. Div. 1986), aff'd o.b., 106 N.J. 556 (1987). That duty ordinarily extends to tenants, members of their families, and guests. Coleman, 54 N.J. at 63 (citing Ellis, 96 N.J. Super. at 547; Restatement (Second) of Torts §§ 360, 361); Anderson, 278 N.J. Super. at 53.

Courts have applied those principles to various areas over which landlords retain control. See, e.g., Scully, 179 N.J. at 126-27 (landlord owed tenant a common law duty to maintain the storage area in a reasonably safe condition, and to exercise reasonable care to guard against the risk of fire); Coleman, 54 N.J. at 62-64 (landlord owed a duty of reasonable care to maintain the heating system in a reasonably safe condition); Linebaugh, 213 N.J. Super. at 119-20 (landlord owed a duty of reasonable care "to his tenant's invitees to prevent injury from a vicious animal kept" in the common area with the landlord's knowledge); Dwyer v. Skyline Apartments, Inc., 123 N.J. Super. 48, 52 (App. Div.) (given the landlord's "control of the water supply system

15

and all its parts," the landlord "unquestionably had the basic duty to maintain and repair the piping and faucets in and leading to plaintiff's bathtub"), aff'd o.b., 63 N.J. 577 (1973).

Whether a duty to exercise reasonable care exists is a question of law for a court to decide. Jerkins v. Anderson, 191 N.J. 285, 294 (2007); Carvalho v. Toll Bros. & Developers, 143 N.J. 565, 572 (1996). That calls for an examination of two critical issues: the landlord's control of the radiator's heating mechanism and whether the unit posed a foreseeable risk of harm.

A.

The Court considered the issue of control in a related context in Coleman. In that case, an infant accidentally caught his foot between a radiator and an "up-pipe" while crawling in his parents' rented apartment. 54 N.J. at 60-61. The two-family "house had a central heating system," and the pipe carried hot water from the basement furnace to the radiator. Id. at 61. The hot pipe burned away the infant's skin, and he was treated in a hospital for second- and third-degree burns. Id. at 61-62. The father, on behalf of his child, sued the landlords. See id. at 60.

At the close of the infant's case, the trial court granted the landlords' motion for involuntary dismissal. Id. at 60, 62. In the court's view, "mere proof that the up-pipe or the radiator or both were not shielded by a covering

16

or a guard or some protective device was not sufficient to create an issue of defendants' negligence for determination by the jury." Id. at 62.

In a split decision, the Appellate Division reversed and remanded for a new trial. Id. at 60; accord Coleman v. Steinberg, 103 N.J. Super. 271 (App. Div. 1968). The Appellate Division majority found that, because both the pipe and attached radiator were part of the house's central heating system and were under the landlords' control, the landlords owed tenants a duty "to exercise due care to maintain the pipe in a reasonably safe condition." Coleman, 54 N.J. at 62. The majority determined that, under the circumstances, the jury should decide whether the landlords negligently failed to discharge that duty. Ibid.

This Court unanimously agreed. It observed that because "the landlords supplied heat to both tenants . . . through a single-control heating unit," the landlords "must be deemed to have retained control of the entire system" -- including pipes that connected the furnace to the radiators. Id. at 63.

Hearkening to common law principles, the Court found that, "[h]aving retained . . . control, the landlords were under a duty to use reasonable care to guard against hazards to members of the tenants' family . . . arising out of the maintenance and operation of the system." Ibid. (citing Monohan v. Baime, 125 N.J.L. 280 (E. & A. 1940); Ellis, 96 N.J. Super. at 547; Prosser on Torts

17

§ 63 at 421 (3d ed. 1964); 2 Harper & James, The Law of Torts, § 27.17 at 1518 (1956)).

In this appeal, as in Coleman, the landlord retained control over the centralized heating system. The landlord supplied heat to all of the building's tenants from a single boiler in a locked basement boiler room. The landlord alone controlled the temperature of the steam in the system. In Coleman, a thermostat in the plaintiff's apartment regulated the units; here, the apartment had no thermostat. Because there is no material difference between the landlords' control of the heating system in Coleman and in this case, there should be no difference about whether a duty of reasonable care exists.

To be sure, the infant in this case was burned from contact with the radiator, not the up-pipe. The tenants in Coleman had no control over the up-pipe. Here, the landlord contends that the shut-off valve allowed tenants not only to turn the radiator on and off but also to adjust the temperature in between. As discussed earlier, the record does not substantiate that claim; it supports a finding that the landlord retained control over the system and, in particular, over the temperature of the radiator's surface.

Tenants could decide whether to turn the heat on or off -- which is little more than an illusion of control on cold wintry days. Based on the record before the Court, they could not regulate the temperature. Even looking at the

18

evidence in the light most favorable to the landlord -- the opposite of what the standard for summary judgment calls for in this motion, see Brill, 142 N.J. at 523, 540 -- the record suggests that tenants could use the shut-off valve to adjust the flow of steam entering the radiator. Even if that were the case, it could take longer to heat a radiator, but the radiator's ultimate temperature -- and its capacity to burn skin on contact -- would be the same. In other words, the flow of boiling hot steam could be modified but not its temperature, which the landlord alone controlled. And no one disputes that at a temperature able to heat a room, a radiator can burn a person on prolonged contact.

## B.

Under settled case law, once again, a landlord has a duty to guard against foreseeable harm that arises from areas "over which the landlord retains control." Scully, 179 N.J. at 121-23.[9] Foreseeability also supports finding that a duty existed here.

The sources outlined in the opening section reveal that the risk of injury from radiators is indeed foreseeable. But neither experts nor nationwide studies nor media reports are needed to disclose the obvious: that many suffer

---

[9] Some commentators observe that foreseeability should be considered by the jury when it decides if a breach occurred, not by the court in deciding whether a duty exists. See Dan B. Dobbs et al., The Law of Torts § 256 (2d ed. 2018). In either case, summary judgment would not be appropriate in this matter.

serious injuries from hot radiators year after year.  See Scully, 179 N.J. at 127 ("Certain dangerous conditions that create the foreseeable risk of fire are well known to ordinary people and are a matter of common knowledge."); Hopkins, 132 N.J. at 450 ("[S]ome hazards are relatively commonplace and ordinary and do not require the explanation of experts in order for their danger to be understood by average persons.").

The point is so well ingrained that parents teach their children to avoid touching radiators.  The risk of harm is particularly foreseeable for young children who do not intuitively understand not to touch a scalding hot radiator or to recoil from it if they do.  Risk of injury is reasonably foreseeable for seniors as well.  Memory loss, reduced agility, thinning skin, and other age-related conditions can "increase the risk of burn injuries."  N.Y.-Presbyterian, Weill Cornell Med. Ctr., Burn Safety and Prevention for Older Adults 3 (2010), https://www.nyp.org/pdf/burn_center/Burn_Safety_ Prevention_Older_Adults_englishWEB.pdf.

Under the circumstances, the absence of prior complaints to a landlord is hardly dispositive.  See Clohesy v. Food Circus Supermarkets, Inc., 149 N.J.

20

496, 508, 514 (1997); see also J.S., 155 N.J. at 338 (noting that knowledge of the risk of injury may be constructive).[10]

Mr. Tagliareni's testimony -- that it "never crossed [his] mind" that radiators like the one that burned Jimmy "have the potential to cause contact burns if someone touched them" -- is also beside the point. See J.S., 155 N.J. at 338 ("Foreseeability as a component of a duty to exercise due care is based on the defendant's knowledge of the risk of injury and is susceptible to objective analysis." (emphasis added)). In his petition for certification, the landlord in fact acknowledged that, "in order to provide heat, a radiator must reach a temperature that is capable of burning a person upon prolonged contact." (The Hudson County Prosecutor's investigation found that it actually took about two minutes for the radiator that burned Jimmy to go from "cool to . . . extremely hot and unbearable to the touch.") Even from the landlord's standpoint, then, the risk of danger posed by a functioning radiator is eminently foreseeable.

---

[10] Relatedly, as in Coleman, if a "dangerous condition existed at the time of the letting, to the landlords' knowledge, actual or constructive, the duty to remedy came into being at the inception of the tenancy." 54 N.J. at 64. A jury's finding of liability would "not depend upon" whether the landlord received "notice of the hazard" later on, in time "to rectify it" before the child's injury. Ibid.

21

Because the landlord retained control of the radiator's temperature and the radiator presented a foreseeable risk of danger, the landlord owed Jimmy -- under well-settled common law principles -- a duty to exercise reasonable care to guard against the risk of harm.

C.

The two factors considered above -- the landlord's retention of control and foreseeability of harm -- serve as a shorthand for the duty analysis in the landlord-tenant context. Those factors are drawn from a broader array of considerations that courts identify, weigh, and balance to determine whether a common law duty exists: "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest." Hopkins, 132 N.J. at 439; cf. Rowe v. Mazel Thirty, LLC, 209 N.J. 35, 44-45 (2012) (noting that the common law categories of trespasser, licensee, and invitee, and the corresponding duty for each, are a shorthand for a full duty analysis under Hopkins). Although it is not necessary to consider them separately in this appeal, the additional Hopkins factors inform the analysis.

Whether a person owes a legal "duty of care to avoid harm to another is ultimately governed by fairness and public policy." Robinson v. Vivirito, 217 N.J. 199, 208 (2014); see also Hopkins, 132 N.J. at 439.

22

The above analysis -- keyed to the common law rule for landlords -- largely addressed two of the Hopkins factors:  the relationship of the parties; and the nature of the risk, including its foreseeability and severity, see J.S., 155 N.J. at 337.  The remaining Hopkins factors -- the opportunity and ability to exercise care, the public interest, and related concerns -- likewise point to the existence of a duty of reasonable care here.

1.

Without question, landlords have the ability and opportunity to exercise care when it comes to radiators in apartment buildings.  Landlords control the centralized heating system in a building and are responsible to maintain it in a safe condition.  They have unfettered access to apartments before new tenants move in and can seek consent from tenants afterward, if needed, to make repairs and improvements.  In this case, a building superintendent was responsible for ongoing maintenance.  The landlord, thus, was plainly in a position to take reasonable steps to guard against risk of harm.

The opportunity to avoid risk in this situation is likewise straightforward.  As this Court observed in Coleman, "[w]e cannot close our eyes to the commonplace fact that pipes like those involved here can be protected by a covering or shield, and that a protective covering or shield is

23

readily available for the unit of pipe <u>and radiator</u> at modest cost."  54 N.J. at 64 (emphasis added).

Fifty years later, that remains true.  A leading burn center recently cautioned that contact burns "are the second most common burns among young children."  N.Y.-Presbyterian, Weill Cornell Med. Ctr., <u>Burn Safety for Infants and Children</u> 3 (2010),  https://www.nyp.org/pdf/burn_center/ BurnSafetyforInfantsandChildren_englishWEB.pdf.  To prevent them, the center offered a number of "simple steps," including "[c]over all radiators and heating pipes."  <u>Ibid.</u>; <u>see also</u> <u>Burn Safety and Prevention for Older Adults</u> at 6 (offering same advice for seniors).

Radiator covers are not complex pieces of equipment.  They come in different shapes, and some have grates to allow warm air to flow through while protecting against direct contact with hot cast-iron radiators.  Experts are not needed to weigh in on their ordinary, everyday use.

In its brief, the landlord submits that "radiator covers reduce the efficiency of the radiators" and that landlords will "have to bear increased energy costs."  No support for the proposition is offered.  The issue, though -- like steam radiators themselves -- is hardly new.  <u>See</u> <u>Home Radiator Burns Among Inner-City Children</u>, 45 <u>Morbidity & Mortality Wkly. Rep.</u> at 815 ("Steam radiator systems are found primarily in older buildings.").

24

Nearly a century ago, engineering experts at the University of Illinois studied the effect of radiator covers on heating efficiency. Arthur C. Willard et al., <u>Investigation of Heating Rooms with Direct Steam Radiators Equipped with Enclosures and Shields</u>, 192 <u>U. of Ill. Eng'g Experiment Station</u> 1 (June 1929), http://hdl.handle.net/2142/4165. The 69-page study, led by the head of the Department of Mechanical Engineering, concluded that "[t]he use of a properly designed radiator enclosure, or shield, results in a gain in steam economy, and equally or more satisfactory air temperature conditions in the room as compared with those obtained by the use of an unenclosed radiator." <u>Id.</u> at 68.

The record, in fact, reveals that some apartments in the building had covers when the superintendent started working there in around 2001. They are sold at most home improvement stores for what the landlord concedes is "not a huge expense." To his credit, the landlord testified that he probably would have provided radiator covers had a tenant asked.

2.

The public interest also favors the imposition of a duty of care. As this Court has explained, "one of the main functions of tort law is to prevent accidents," and "[o]ne of the central rationales for imposing liability in tort law is to deter tortious behavior." <u>Hopkins</u>, 132 N.J. at 448 (citing Richard

25

Posner, Economic Analysis of Law 78 (1972)). The imposition of a duty of care on landlords would serve that aim. It would help protect tenants against foreseeable and preventable dangers that arise from the ordinary and reasonable use of radiators. That protection would naturally extend to the most vulnerable -- like the nine-month-old who suffered severe burns and permanent scarring in this case.

Our State, of course, "has a strong interest in protecting children." Jerkins, 191 N.J. at 297 (imposing a duty on schools to supervise school children during dismissal); see also DYFS v. M.W., 398 N.J. Super. 266, 295 (App. Div. 2008) ("The clear public policy of this State is to protect and preserve the welfare of its children . . . .").

To that end, many regulations explicitly require that, in places where children are certain to be present, hot water and steam radiators must be shielded. See N.J.A.C. 3A:52-5.3(d)(2) ("Steam and hot water pipes and radiators" in child care centers "shall be protected by screens, guards, insulation, or any other suitable, non-combustible protective device.") (adopted by the Department of Children and Families); N.J.A.C. 3A:53-5.4(e) ("[H]ot radiators" in "[s]helter facilities and shelter homes caring for children six years of age and under . . . shall be adequately protected by screens or guards.") (adopted by the Department of Children and Families); N.J.A.C.

8:25-4.3(d) (A youth "camp director shall ensure that all . . . hot water and steam radiators . . . are shielded to prevent burns.") (adopted by the Department of Health). Although not applicable here, the regulations reflect both an awareness of the danger unprotected radiators present -- on the part of multiple public agencies -- and the strong public interest to prevent burns that unshielded radiators foreseeably inflict on young children. See Coleman, 54 N.J. at 65.

Protecting tenants is also a matter of keen public interest. See N.J.S.A. 55:13A-2 (declaring that the Hotel and Multiple Dwelling Law is designed to protect "the health and welfare" of tenants and "assure the provision . . . of decent, standard and safe units of dwelling space").

3.

Tort law also considers how the imposition of a duty would work in practice. See Hopkins, 132 N.J. at 443 (citing Weinberg v. Dinger, 106 N.J. 469 (1987)). The landlord contends that "a duty on landlords to cover radiators . . . would impose too heavy a burden on all property owners." Landlords that install covers, though, could likely pass on the cost to tenants over a period of time. Cf. Trentacost v. Brussel, 82 N.J. 214, 226 (1980) (noting that landlords "can spread the cost of maintenance over an extended period of time among all residents enjoying its benefits"). Tenants with short-

27

term leases, on the other hand, do "not have the same incentive" to maintain an apartment. See Restatement (Second) of Torts § 356 cmt. a; see also Restatement (Third) of Torts, § 53 cmt. f(6). Some tenants are also unable to pay the full cost of a protective device up front. Restatement (Second) of Torts § 356 cmt. a.

In addition, nothing in the record suggests that the consequences from a duty of care would be unreasonably burdensome. See Coleman, 54 N.J. at 64 (noting that "a protective covering or shield is readily available for the unit of pipe and radiator at modest cost"); see also Hopkins, 132 N.J. at 446 (finding the imposition of a duty on real estate brokers to inspect a home and give warnings would not "be an unreasonable economic strain"). Once again, the landlord conceded that the cost is "not a huge expense."

4.

Finally, it is not unfair to impose a duty on landlords -- who have control of a heating system and, in particular, of the temperature coursing through hot radiators -- to exercise reasonable care to prevent radiator burns. Hopkins, 132 N.J. at 439 ("[W]hether a duty exists is ultimately a question of fairness." (quoting Weinberg, 106 N.J. at 485)).

Landlords are required by regulation to provide heat to residential tenants. See N.J.A.C. 5:10-14.4(a) (requiring that from October 1 through

28

May 1, landlords must maintain "every habitable room . . . at a temperature of at least" 65 or 68 degrees Fahrenheit depending on the time of day, unless the tenant agrees to supply heat). Landlords are also well-positioned to guard against the foreseeable dangers that radiators present. And "[w]hen the defendant's actions are 'relatively easily corrected' and the harm sought to be prevented is 'serious,' it is fair to impose a duty." See J.S., 155 N.J. at 339-40 (quoting Kelly v. Gwinnell, 96 N.J. 538, 549-50 (1984)).

Consideration of the additional Hopkins factors, then, further supports the existence of a duty of care that would require landlords to take reasonable steps to protect tenants from radiator burns.

D.

Rivera v. Nelson Realty, LLC, 858 N.E.2d 1127 (N.Y. 2006), does not call for a different outcome. In that case, the New York Court of Appeals dispensed with an apartment dweller's claim that landlords have a common law duty to provide radiator covers. Id. at 1127, 1129. In its analysis, the court did not consider the key factors relevant here: who controlled the heating mechanism, and whether the radiator posed a foreseeable risk of harm, among other relevant considerations. Consistent with New York law, the ruling instead addressed whether the landlord "breached any duty to keep plaintiffs' apartment in good repair." Id. at 1129 (citing New York's Multiple

29

Dwelling Law § 78). And the <u>Rivera</u> Court reasoned that because the uncovered radiator needed no repairs, the landlord had no duty to remedy the alleged hazard. <u>Id.</u> at 1130. That principle, however, conflicts with this Court's decision in <u>Coleman</u>, which imposed a duty of reasonable care to address any hazard posed by an exposed steam pipe -- that was in good working order.

In addition, the majority correctly notes that "it is not necessary for a regulatory body to impose a duty before the common law can be expanded." <u>See</u> <u>ante</u> at ___ (slip op. at 33). Nor should agency inaction determine whether a common law duty exists. If great weight were given to whether a regulatory body had acted first, there would be little place for the common law. Also, a broad range of cases in which this Court has found a common law duty -- even though agencies had not acted -- could be undermined.

E.

Finding that a duty of care exists does not mean that landlords must provide covers for all radiators or face sole liability for all injuries caused by radiators. They instead would have a duty to exercise reasonable care under the circumstances to guard against the risk of harm radiators pose. That may include the use of covers or shields, or some other reasonable step to protect against foreseeable dangers. <u>See</u> <u>Clohesy</u>, 149 N.J. at 520.

30

Whether the uncovered radiator in this case in fact posed a dangerous condition, and whether the landlord violated its duty to exercise reasonable care to guard against foreseeable injury, are questions that should have been submitted to the jury. See Coleman, 54 N.J. at 64; Hopkins, 132 N.J. at 449; J.H., 454 N.J. Super. at 182. As in Coleman, and for the reasons discussed above, a reasonable jury could have answered both questions affirmatively. 54 N.J. at 64.

A finding of a breach of duty does not mean that proximate cause will be found, or that liability will not be apportioned among the landlord and others determined to be liable for Jimmy's injury. Proximate cause and comparative fault, like breach, are ordinarily questions for the jury. Perez v. Wyeth Labs. Inc., 161 N.J. 1, 27 (1999) (regarding proximate cause); N.J.S.A. 2A:15-5.3 (regarding percentage of responsibility for damages for each responsible party, and right of contribution from joint tortfeasors).

Because it was for the jury to decide whether the landlord breached a duty of care in this case, I believe it was error to grant summary judgment against Jimmy.

The appeal raises separate, related questions: whether N.J.A.C. 5:10-14.3 imposes a duty on landlords relating to radiators, and whether the regulation affects the above common law analysis.

Multi-unit dwellings with three or more apartments are subject to the Hotel and Multiple Dwelling Law. N.J.S.A. 55:13A-1 to -28. The law is designed to protect "the health and welfare" of tenants and assure "decent, standard and safe units of dwelling space." N.J.S.A. 55:13A-2. As the Legislature declared, the statute is remedial legislation that "shall be liberally construed to effectuate [its] purposes." Ibid.

The law "confers broad authority" on the Commissioner of the Department of Community Affairs, Rothman v. Dep't of Cmty. Affairs, 226 N.J. Super. 229, 231 (App. Div. 1988), and delegates power to the Commissioner to issue regulations, Trentacost, 82 N.J. at 230. Among other things, the statute directs that any regulations shall provide standards for "protective equipment . . . reasonably necessary to the health, safety and welfare" of tenants, including "central heating units." N.J.S.A. 55:13A-7.

DCA has promulgated various regulations under the Act. N.J.A.C. 5:10-1.10(b), for example, requires the Bureau of Housing Inspection to inspect

dwellings with three or more units every five years.  N.J.A.C. 5:10-14.7(a)

requires that "[t]he heating system . . . be inspected annually."

Of particular importance, N.J.A.C. 5:10-14.3(d) states that "[t]he heating

system, including such parts as heating risers, ducts and hot water lines, shall

be covered with an insulating material or guard to protect occupants and other

persons on the premises from receiving burns due to chance contact."

Like the law it seeks to implement, that regulation should be construed

liberally.  See N.J.S.A. 55:13A-2; N.J.A.C. 5:10-1.5(a) (the regulations on

maintenance of hotels and multiple dwellings "shall be liberally interpreted to

secure the beneficial purposes thereof").

The regulation does not define "heating system."  It instead has a non-

exhaustive list that includes risers, ducts, and hot water lines.  Although the

regulation neither includes nor excludes "radiators," its stated purpose

logically extends to them:  to protect against burns from chance contact.  As

the Appellate Division aptly noted, "no part of an apartment's heating system

. . . [is] more likely to be in contact with [people] than the radiator."  J.H., 454

N.J. Super. at 187.

DCA has not offered its view of the meaning of the regulation or how it

is enforced.  After the Appellate Division published its decision, DCA did not

seek to enter the case as amicus and file a brief.  Neither the inspector's

33

comments at his deposition, nor the two certificates of inspection in the record that certify the building's compliance with the statute, represent DCA's official views on the meaning of N.J.S.A. 5:10-14.3(d). As a result, those items are not entitled to the deference ordinarily accorded an agency about the meaning of a law or regulation within the agency's area of expertise. See In re Election Law Enf't Comm'n Advisory Opinion No. 01-2008, 201 N.J. 254, 262 (2010).

That said, the regulation could easily have included the term "radiator," but it does not. Again, the statute and regulations do not expressly say that radiators are -- or are not -- a part of the heating system. That simple fact matters. To the extent the statute and regulations do not address whether a radiator, as part of a heating system, should be insulated or otherwise shielded to prevent accidental burns, the statute has not supplanted the common law.

Courts construe statutes narrowly if they are in derogation of the common law, especially when a statute grants immunity from tort liability. Marshall v. Klebanov, 188 N.J. 23, 37 (2006). Plus here, although the law does not mention radiators, its purpose is clear: to protect "the health, safety and welfare" of tenants, N.J.S.A. 55:13A-7, and, in particular, to protect them "from receiving burns due to chance contact," N.J.A.C. 5:10-14.3(d).

34

Therefore, neither the statute nor its implementing regulations preempt the common law duty of care that should apply.

VI.

In the end, the Legislature has the final say in this case. If a court imposes a duty of care and the Legislature disapproves of it, the Legislature can step in and override the ruling. See, e.g., Angland v. Mountain Creek Resort, Inc., 213 N.J. 573, 582-83 (2013) (citing Hubner v. Spring Valley Equestrian Ctr., 203 N.J. 184, 198-202 (2010)) (noting the enactment of the New Jersey Ski Act in response to a Vermont Supreme Court decision that relied, in part, on a decision of this Court); Sciarrotta v. Glob. Spectrum, 194 N.J. 345, 359 (2008) (noting the enactment of the New Jersey Baseball Spectator Safety Act of 2006 in response to Maisonave v. Newark Bears Prof'l Baseball Club, Inc., 185 N.J. 70 (2005)).

Here, the majority finds no duty under the statute or the common law. The Legislature can override that conclusion as well. It is free to amend the Hotel and Multiple Dwelling Law and require that protective covers be placed on hot radiators -- to protect tenants, their families, and guests from serious injuries they will undoubtedly continue to suffer year after year.

For all of those reasons, I respectfully dissent.

35